CASE NO. 24-1432

IN THE
UNITED STATES COURT OF APPEALS
FOR THE
FOURTH CIRCUIT

SALLY TARQUINIO,

*Appellant-Plaintiff,*

vs.

JOHNS HOPKINS UNIVERSITY APPLIED PHYSICS LAB

*Appellee-Defendant.*

On Appeal from the United States District Court for the District of Maryland
Civil Action No. 1:23-cv-00727-RDB
(The Honorable Richard D. Bennett, presiding)

**OPENING BRIEF OF APPELLANT**

Francis J. Collins, Esq.
KSC Law
201 N. Charles St., Tenth Floor
Baltimore, Maryland 21201
Fed Bar # 04272
AIS # 8501010118
fjcollins@kscadvocates.com
410-244-1010
Attorney for Appellants

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1432        Caption: Sally Tarquinio v. Johns Hopkins University Applied Physics Lab

Pursuant to FRAP 26.1 and Local Rule 26.1,

Sally Tarquinio
(name of party/amicus)

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2. Does party/amicus have any parent corporations?  ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct
   financial interest in the outcome of the litigation?                    ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected
   substantially by the outcome of the proceeding or whose claims the trade association is
   pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
   party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
   caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
   corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational
   victim of the criminal activity and (2) if an organizational victim is a corporation, the
   parent corporation and any publicly held corporation that owns 10% or more of the stock
   of victim, to the extent that information can be obtained through due diligence.

Signature: _____     Date: _____06/04/2024_____

Counsel for: Appellant _____

- 2 -                    [Print to PDF for Filing]

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................v

I.    JURISDICTIONAL STATEMENT ..................................................1

II.   STATEMENT OF THE ISSUES ....................................................1

III.  STATEMENT OF THE CASE ......................................................2

IV.   SUMMARY OF ARGUMENT ......................................................5

V.    ARGUMENT ...........................................................................8

      Standard of Review ...............................................................8

      Summary of the Facts ...........................................................8

      A.    THE DISTRICT COURT ERRED IN HOLDING, AS A MATTER OF
            LAW, THAT TARQUINIO WAS RESPONSIBLE FOR THE
            BREAKDOWN IN THE INTERACTIVE PROCESS .....................15

            1.    There is substantial evidence that APL caused the breakdown in
                  the interactive process. ...............................................18

            2.    The District Court erred when it made at least two key factual
                  findings at the summary judgment stage that were contradicted
                  by evidence in the record. .........................................21

            3.    The medical release form that APL demanded Tarquinio sign
                  was overly broad and intrusive making it an unlawful medical
                  inquiry under the ADA.  Consequentially, the District Court
                  erred when finding Tarquinio's refusal to sign the unlawful
                  medical release form was evidence that she caused the
                  interactive process to breakdown. ...............................25

            4.    The District Court erroneously faulted Tarquinio for not
                  accepting an ineffective accommodation. ........................27

B.    THE DISTRICT COURT ERRED IN HOLDING THAT TARQUINIO'S TERMINATION WAS NOT BECAUSE OF HER DISABILITY. ...................................................................28

    1.    The District Court made an impermissible distinction between APL terminating Tarquinio because of her disability and terminating her because she could not comply with an APL employment standard because of her disability. .......................28

    2.    The District Court failed to analyze whether APL's vaccine mandate was job-related and consistent with business necessity or whether Tarquinio posed a "direct threat" to other employees...................................................................30

C.    THE DISTRICT COURT ERRED IN HOLDING THAT THE EMPLOYER'S MEDICAL INQUIRIES WERE LAWFUL AND JUSTIFIED...................................................................33

VI.    CONCLUSION..................................................................39

VII.    STATEMENT REGARDING ORAL ARGUMENT ....................................39

iv

# TABLE OF AUTHORITIES

**Cases**

*Angelini v. Baltimore Police Dep't*, 464 F. Supp. 3d 756 (D. Md. 2020) ...............22

*Atkins v. Salazar*, 677 F.3d 667 (5th Cir. 2011) ......................................................31

*Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007) .......... 29, 30, 31, 34

*Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130 (7th Cir. 1996) ........ 16, 17

*Blake v. Baltimore Cty.*, 662 F. Supp. 2d 417 (D. Md. 2009) ...................................36

*Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332 (4th Cir. 2022)................... 25, 27, 37, 38

*Conroy v. New York State Dept. of Corr. Services*, 333 F.3d 88 (2d Cir. 2003) ......37

*Coursey v. Univ. of Maryland E. Shore*, 2013 WL 1833019 (D. Md. Apr. 30, 2013), aff'd, 577 Fed. Appx. 167 (4th Cir. 2014) ............................................................37

*Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314 (4th Cir. 2011) .17

*Cripe v. City of San Jose*, 261 F.3d 877 (9th Cir. 2001) ................................... 31, 37

*Davenport v. Michelin N. Am., Inc.*, 2012 WL 5381193 (D.S.C. 2012), report and recommendation adopted, 2012 WL 6212517 (D.S.C. Dec. 13, 2012)...............37

*Davis v. City of Charlottesville Sch. Bd.*, 498 F. App'x 231 (4th Cir. 2012) .........8

*Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323 (4th Cir. 2012)................. 17, 22

*E.E.O.C. v. Blue Sky Vision, LLC*, No. 1:20-CV-285, 2021 WL 5535848 (W.D. Mich. 2021) ................................................................................................... 25, 26

*E.E.O.C. v. UPS Supply Chain Sols.*, 620 F.3d 1103 (9th Cir. 2010) ......... 19, 20, 28

*Fredenburg v. Contra Costa Cnty. Dep't of Health Servs.*, 172 F.3d 1176 (9th Cir.1999) ................................................................................................................37

*Haneke v. Mid-Atl. Cap. Mgmt.*, 131 F. App'x 399 (4th Cir. 2005) ................. 16, 17

*Hannah P. v. Coats*, 916 F.3d 327 (4th Cir. 2019) ...................................................37

*Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030 (8th Cir. 2020)......................... 31, 37

*Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562 (4th Cir. 2015).............. 17, 22

*James v. Goodyear Tire & Rubber Co.*, 354 F. App'x 246 (6th Cir. 2009).............26

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208 (2d Cir. 2001)...............19

*Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595 (6th Cir. 2018) ...................................................................................................................... 18, 19

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661 (2022).......................................................................................34

*Nawara v. Cnty. of Cook*, 2019 WL 1399972 (N.D. Ill. Mar. 28, 2019) .................26

*Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89 (2d Cir. 2015) .................................28

*Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176 (4th Cir. 2009)...............................8

*Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142 (3d Cir. 1999)................................19

*Tolan v. Cotton*, 572 U.S. 650 (2014) .......................................................................22

*US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002) ....................................................28

*Williams v. ABM Parking Servs. Inc.*, 296 F. Supp. 3d 779 (E.D. Va. 2017)...........31

*Wilson v. Dollar Gen. Corp.*, 717 F.3d 337 (4th Cir. 2013)....................................16

**Statutes**

28 U.S.C. § 1291.........................................................................................................1

28 U.S.C. § 1331.........................................................................................................1

29 U.S.C. § 2613(c) ...................................................................................................24

29 U.S.C. § 655(b) .....................................................................................................34

42 U.S.C. § 12101 .......................................................................................................1

42 U.S.C. § 12112(a)............................................................................................ 15, 34

42 U.S.C. § 12112(b)(3)............................................................................................30

42 U.S.C. § 12112(b)(3)(A) ............................................................29

42 U.S.C. § 12112(b)(5)(A) ............................................................15

42 U.S.C. § 12112(b)(6) ..................................................................29

42 U.S.C. § 12112(d)(1) ..................................................................34

42 U.S.C. § 12112(d)(4) ..................................................................26

42 U.S.C. § 12112(d)(4)(A) ...................................................... 34, 36

42 U.S.C. § 12112(d)(4)(B) .............................................................35

### Other Authorities

E.E.O.C., *Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act* .............25

### Regulations

29 C.F.R. § 1630.14(c) ....................................................................35

29 C.F.R. § 1630.15(b)(2) ...............................................................31

29 C.F.R. § 1630.2(n) ......................................................................31

29 C.F.R. § 1630.7 ...........................................................................31

45 C.F.R. § 164.508(c) ..........................................................6, 11, 26

## APPELLANT'S OPENING BRIEF

### I.  JURISDICTIONAL STATEMENT

The United States District Court for the District of Maryland, Richard D. Bennett, granted a motion for summary judgment and rendered judgment against the Appellant, Sally Tarquinio (Tarquinio), and in favor of the Appellee, Johns Hopkins Applied Physics Lab (APL), on April 11, 2024.  JA281.  The judgment adjudicated all claims as to all parties.  JA290-92.  The District Court's jurisdiction was established under 28 U.S.C. § 1331 as a civil proceeding arising under the laws of the United States, specifically the Americans with Disabilities Act, (ADA), 42 U.S.C. § 12101 et seq.

Under 28 U.S.C. § 1291 the Court of Appeals has jurisdiction over all final decisions of the federal district courts.  Tarquinio filed a timely Notice of Appeal on May 10, 2024.  JA03.

### II.  STATEMENT OF THE ISSUES

**A.  Did the District Court err when it held, as a matter of law, that Tarquinio caused the breakdown in the interactive process?**

**Short Answer: Yes.  Despite the District Court's finding that Tarquinio "refused to participate [in the interactive process]," there is significant evidence that Tarquinio actively participated in the interactive process and that APL did not; thus, there is a genuine issue of material fact, which precludes granting summary judgment.**

1

B.  **Did the District Court err when it held, as a matter of law, that Tarquinio was not fired because of her disability even though she was fired for not complying with APL's vaccine mandate and she was unable to comply with the vaccine mandate because of her disability?**

   **Short Answer: Yes.  The District Court erred when it held that her disability was not a factor in APL's termination decision.**

C.  **Did the District Court err by failing to examine the nature of Tarquinio's job before holding that APL's blanket vaccination policy and its overly broad medical release form were job-related and consistent with business necessity?**

   **Short Answer: Yes.  APL's demand for vaccination status and the broad medical release form that APL required constitute medical inquiries.  APL should have been required to prove that those inquiries are job-related and consistent with business necessity and the analysis must factor in the employee's essential functions of her specific job.  The District Court failed to engage in that analysis.**

## III.  STATEMENT OF THE CASE

Tarquinio was employed by APL for roughly 16 years and worked at APL's facility in Laurel, Maryland.  JA47, JA171, JA20.  Tarquinio worked effectively and safely on-site at the Laurel facility for roughly 18 months during the pandemic while unvaccinated and before APL instituted a COVID-19 vaccine mandate (vaccine mandate).  JA208.  On September 14, 2021, APL enacted a company-wide vaccine mandate.  JA173.  Tarquinio submitted a timely medical exemption request that described her disability as Chronic Lyme and Lyme-induced Immune Dysregulation, included an explanation for why her disability prevented her from receiving a

COVID-19 vaccine (COVID vaccine), and a note signed by her Lyme Disease specialist, Dr. Schwartz, confirming her condition and her need for an exemption from the vaccine. JA99, JA100. Tarquinio also submitted documentation supporting that she was diagnosed with Lyme Disease in 2012. JA73, JA102. APL did not accept Dr. Schwartz's recommendation and denied Tarquinio's request for an accommodation from the vaccine mandate and required her to receive a COVID vaccine within the next week. JA166-67. Roughly one week later, APL terminated Tarquinio for not complying with the vaccine mandate. JA171.

Tarquinio filed a timely complaint with the E.E.O.C. alleging disability discrimination. JA06. Tarquinio then received a Notice of Right to Sue on December 16, 2022. *Id.* She timely filed this case and, on October 10, 2023, Tarquinio filed her Amended Complaint against APL. JA283. The Amended Complaint included three counts under the ADA. JA12-15. Count I was for failure to accommodate her disability, Count II was for employment discrimination on account of her disability, and Count III was for unlawful medical inquiries. *Id.* On January 11, 2024, APL moved for summary judgment regarding all three counts. JA03. On April 11, 2024, the District Court granted summary judgment in favor of APL on all three counts. JA290-92.

As to Count I, Tarquinio's failure to accommodate claim, the District Court held, as a matter of law, that Tarquinio was at fault for a breakdown in the interactive

3

process and that APL bore no responsibility for that breakdown. JA288-89. The Court pointed to Tarquinio's refusal to sign a blanket medical records release form and contended that Tarquinio "continuously refused" to provide documentation related to her disability. JA289. Tarquinio contends that the records release form was overly broad and her refusal to sign should not have been held against her. Tarquinio also contends that she supplied sufficient medical documentation, acted reasonably, and did not "continuously refuse" to provide information related to her accommodation request.

As to Count II, Tarquinio's disability discrimination claim, the District Court held that Tarquinio failed to provide any evidence from which a reasonable jury could conclude that she was fired because of her disability. JA291. Rather, the District Court couched the termination as having been related to a failure to be vaccinated. *Id.* Tarquinio contends that the District Court erred by drawing a distinction where one does not exist—the termination was obviously related to both her disability and her consequent refusal to comply with the vaccine mandate which she viewed as dangerous to her health because of her disability.

As to Count III, Tarquinio's unlawful medical inquiry claim, the District Court held as a matter of law, that both APL's vaccine mandate and APL's broad medical release form were job-related and consistent with business necessity. JA292. This ruling was made without considering Tarquinio's specific job functions and without

4

considering the unlimited scope of the medical release form that APL demanded Tarquinio sign.  *Id.* Tarquinio contends that a reasonable jury could conclude that the vaccine mandate was not job-related and consistent with business necessity.  She was an office worker who had no public-facing duties, worked for eighteen months unvaccinated during the pandemic, and was able to engage in other disease mitigation measures.  JA208, JA280.  Vaccination was not the only game in town.  Moreover, the vaccine was a public health measure, not an essential function of her position.

Tarquinio filed a timely notice of appeal.  JA03.

## IV.    SUMMARY OF ARGUMENT

The District Court erred by dismissing each of Tarquinio's three ADA counts against APL.

First, the District Court erred by weighing the evidence and holding that no reasonable jury could find APL at fault for the breakdown of the interactive process and, instead, found that Tarquinio acted in bad faith.  JA289-90.  Tarquinio contends that it was not her acting in bad faith but, rather, that APL was doing so, and that there is sufficient evidence in the record to create a factual dispute on this issue.

One part of this argument is that the District Court faulted Tarquinio for the breakdown in the interactive process by citing the fact that she refused to sign a blanket release of all her medical records.  *Id.*  That release form, provided by APL,

is inherently evidence of APL's bad faith.  It was not limited to the disability in question and would have authorized APL to obtain all of her medical records from birth forward and would have allowed APL to speak to every medical provider she ever consulted.  JA278.  For it to have been considered a proper part of the interactive process it should have been limited in scope to the specific disability, Chronic Lyme and Lyme-induced Immune Dysregulation, and should have complied with the Privacy Rule of HIPAA, 45 C.F.R. § 164.508(c).[1]  Its extreme overbreadth made it an inappropriate factor for the District Court to consider and its patent failure to comply with the most basic requirements of a HIPAA compliant medical release form prevent it from being used to paint Tarquinio as noncooperative.

Second, the District Court erred by dismissing Tarquinio's claim for disability discrimination by drawing a distinction between being fired for refusing the vaccine as opposed to being fired because the vaccine was incompatible with her disability.  JA290.  The Court held that terminating an employee because she could not comply with an employer policy because of her disability was not a violation of the ADA even though the ADA explicitly recognizes such a termination as "discrimination because of a disability."  The District Court should have required APL to prove that

---

[1] The core elements of a valid medical records release authorization include: A meaningful description of the information to be disclosed; The name of the individual or the name of the person authorized to make the requested disclosure; The name or other identification of the recipient of the information; A description of each purpose of the disclosure (The statement "at the request of the individual" is sufficient when the individual initiates the authorization and does not, or elects not to, provide a statement of the purpose); An expiration date or an expiration event that relates to the individual; A signature of the individual or their personal representative (someone authorized to make health care decisions on behalf of the individual) and the date.  45 C.F.R. § 164.508(c).

unwavering adherence to its vaccine mandate was "job-related and consistent with business necessity."

Third, the District Court erred by dismissing Tarquinio's claim that APL was conducting unlawful medical inquiries, prohibited by the ADA. JA292. The ADA prohibits an employer from making medical inquiries unless they are job-related and consistent with business necessity. To make that determination, regarding the vaccine mandate and its accompanying medical inquiries, one must examine Tarquinio's specific job, her essential functions, her specific workplace, and her ability to comply with other effective COVID mitigation methods. JA291. APL bears the burden of proving the "job-related and consistent with business necessity" standard. The District Court only made conclusory statements regarding the application of this standard to APL's vaccine mandate and never examined the facts of Tarquinio's job. *Id.* Additionally, the overbreadth of the medical records release form is also implicated in this Count. The District Court erred by holding that the medical release form that APL required Tarquinio to sign was job-related and consistent with business necessity without scrutinizing the scope of the medical release form. *Id.* Such scrutiny would have revealed that the medical release form was unlimited in scope and not narrowly tailored to address Tarquinio's request for an accommodation. It was an overly broad and unlawful demand that Tarquinio consent to disclose her entire medical history. JA278.

Summary judgment in favor of APL on each count must be overruled.

## V.    ARGUMENT

### Standard of Review for all issues

Review of a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure is *de novo*.   *Davis v. City of Charlottesville Sch. Bd.*, 498 F. App'x 231, 232 (4th Cir. 2012) (citing *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 179–80 (4th Cir. 2009)).

### Summary of the Facts

Sally Tarquinio worked as an engineer for APL in Laurel, Maryland for sixteen years and earned a promotion around the time she was terminated.   JA06, JA11, JA47, JA54.   Tarquinio worked in APL's Air and Missile Defense Department. JA20, JA280.   She had an office at APL where she conducted her work, which was mostly "sedentary work." JA206-07, JA280.   Tarquinio's job description, as of October 2021, lists her job title as one that had the flexibility to be conducted from either APL's office or the employee's home.   JA280.   Tarquinio worked in person at all relevant times, including the roughly eighteen months from the beginning of the pandemic in March 2020 to when APL implemented the mandatory vaccine policy in mid-September of 2021.   JA208.   Other workers, including Tarquinio's similarly situated co-workers were allowed to work remotely.   JA207.   During the pandemic, some APL employees worked onsite while following certain protocols such as

masking, social distancing, testing for COVID, and reporting positive test results for COVID.  JA22, JA231.

In 2004 and again in 2012, Tarquinio contracted Lyme Disease, which caused her to suffer "post-treatment Lyme disease syndrome." JA283.  Dr. Schwartz, Tarquinio's provider that specializes in treating Lyme disease, specified the diagnosis as "Chronic Lyme disease plus Lyme-induced Immune Dysregulation." JA185.  A recent Harvard University Medical School article explains chronic Lyme disease as follows:

> [Chronic Lyme includes the] various terms for persistent [Lyme] symptoms, such as post-treatment Lyme disease (PTLD), post-treatment Lyme disease syndrome (PTLDS), long Lyme, or chronic Lyme.  PTLD is a research term used to define the 10% to 20% of people who continue to experience symptoms after completing antibiotic treatment for Lyme disease.  Those people meet the following criteria: a prior documented episode of Lyme disease meeting CDC criteria in which all objective signs resolve[.]

JA07.  Harvard Medical School continues its discussion of Chronic Lyme symptoms:

> Regardless of terminology, persistent symptoms of Lyme disease are real and well documented.  However, the cause (or causes) are poorly understood.  Current theories include… Immune system dysregulation: The body's response to fighting infection runs amok and persists long after it is helpful.  This may be due to lingering spirochete (Lyme bacteria) proteins, persistent inflammation, or other autoimmune issues[.]

JA08.  Dr. Schwartz explained: "Chronic Lyme infection that [Tarquinio] had induced some autoimmune kind of dysregulation." JA186.  Dr. Schwartz gave

9

Tarquinio the Harvard articles to inform her and APL about the fact that autoimmune dysregulation is a common problem for patients who contract Lyme Disease. JA192.

In September of 2021, APL announced that it was enacting a vaccine mandate that applied to all employees. JA173. Employees had one month to submit proof of at least one dose of a COVID vaccine. *Id.*

Tarquinio submitted a timely medical exemption form. JA99. In her "Employee Request for Medical Accommodation" form she communicated that she could not take the vaccine because her immune dysregulation from years of Chronic Lyme Disease prevents her from introducing antigens in her body that could trigger a negative immune response. *Id.* Vaccines contain antigens that can cause negative immune responses. JA196. Along with the medical accommodation form, Tarquinio submitted a "Medical Verification for Exemption from COVID-19 Vaccination Requirement" form signed by Dr. Schwartz. This treating doctor stated Tarquinio should not be immunized for COVID and listed "Chronic Lyme" and "Lyme induced Immune Dysregulation" as the reason. JA100. To further demonstrate her need for an accommodation, Tarquinio submitted bloodwork from 2012 that evidenced her previous Lyme disease diagnosis. JA102, JA73.

On October 11, 2021, an APL Accommodations Coordinator asked for Tarquinio to complete a "Request for Personal Medical Records" form (medical release form). JA116. This form stated no limitations on the questions that APL

could ask Tarquinio's doctors, was not limited in terms of time, and was not limited with regard to the records that could be requested with the release form. JA278. The form did not specify that APL's resulting medical inquiries would be limited to information relevant to Tarquinio's accommodation request. *Id.* Tarquinio correctly interpreted the form as a broad release that could be used by APL to obtain all her medical records and speak with all her medical providers, on all matters. JA76. It was in direct violation of Federal Regulations pertaining to valid HIPAA authorizations, 45 C.F.R. § 164.508(c), and in violation of the limited scope of medical inquiries allowed under the ADA.

On October 14, 2021, Dr. Clarence Lam, APL's Medical Officer, stated, in an email to the Accommodations Coordinator, that Lyme disease is not a medical contraindication to receiving the COVID vaccine. He claimed that he wanted more information to understand why the diagnosis would prohibit her from getting the vaccine but later events showed he would blindly follow the CDC's statements regarding contraindications and not consider an exception as a reasonable accommodation. JA224. Tarquinio sent a long email to APL accommodation officials emphasizing her love for her job and sadness regarding the thought of having to choose her health over her job. JA120. The email reiterates that she has "Lyme-induced immune dysregulation" and that "[i]mmune dysregulation is an excessive immune activation from the years of chronic Lyme Disease, where [her

immune system] overreact[s] against [her] body's tissues due to years [of] trying to kill off the Lyme spirochetes." Tarquinio then continued by stating that "introduc[ing] another antigen" will probably lead to a bad health outcome. *Id.*

Tarquinio ended the letter by offering a specific accommodation that entailed (1) taking a weekly saliva based COVID test administered at a "quality facility" and paid for by herself, and (2) working remotely a couple of days per week. *Id.* This proposed accommodation would have been in addition to the social distancing and masking policies that had been in place since the beginning of the pandemic and that Tarquinio strictly followed. JA231, JA206. APL did not specifically acknowledge this accommodation request in a response to Tarquinio and it did not make a counteroffer.

On October 18, 2021, Dr. Lam reiterated that more updated documentation was needed from Tarquinio and that he would reconsider her accommodation request if she provided more current documentation. JA225. In response to Dr. Lam's email, APL's Accommodation Coordinator requested updated medical documentation and more information regarding why the COVID vaccine is contraindicated regarding Tarquinio's condition. JA118. On November 15, 2021, Tarquinio provided a long description of her medical journey with Lyme disease and her resulting chronic conditions, her struggle to conduct her life with the illness, her treatment with Dr.

Sivieri and Dr. Schwartz, and her fears regarding the COVID vaccines due to her medical history.  JA122-25.

Once again, Tarquinio concluded the email by offering a similar accommodation request, which was (1) weekly saliva based COVID testing at quality facility, and (2) working two days a week at the office and three days a week remotely.  JA125.  APL never acknowledged this accommodation request in a response to Tarquinio and APL did not make a counteroffer or compromise.

On November 22, 2021, Tarquinio spoke with an accommodations coordinator over the phone.  JA90, JA166.  The accommodations coordinator requested that she sign the broad medical release form.  JA177.  Tarquinio took away from the call that the accommodations coordinator did not understand her situation.  JA90.  Additionally, APL's approach to the accommodation process made Tarquinio believe that APL was challenging the legitimacy of her doctor.  JA95-96.  On November 29, 2022, Dr. Lam stated that Lyme Disease is not a CDC recognized contraindication to receiving the COVID vaccine and closed his file.  JA228.

On November 30, 2021, APL notified Tarquinio that her accommodation request was denied because Lyme Disease "is not a medical contraindication to receiving the COVID-19 Vaccine."  JA166.  Tarquinio was then required to submit proof of vaccination by December 7, 2021.  JA167.

13

On December 3, 2021, Tarquinio provided updated bloodwork which showed her CD57 was low, and she briefly explained the medical relevance of CD57 medical data. JA169. CD57 can be indicative of a person having an infection. JA245. A higher CD57 means a healthier immune system while a lower number means a less healthy immune system. JA255. Some doctors view CD57 as an indicator of Chronic Lyme Disease. JA244, JA255.

On December 6, 2021, APL's accommodation's coordinator clarified, in an email to Tarquinio, that her accommodation request would not be approved even if she showed that she had her "underlying condition" because the CDC had not stated that Lyme Disease is contraindicated for receiving the COVID vaccine. JA169. Neither Dr. Lam nor anyone else at APL addressed the fact that Tarquinio was not seeking the accommodation because of active Lyme Disease but rather because of "Chronic Lyme" and "Lyme-induced Immune Dysregulation."

On December 7, 2021, APL terminated Tarquinio. JA171. It is undisputed that Tarquinio did not comply with the vaccine mandate due to her Chronic Lyme and Lyme-induced Immune Dysregulation and her concern that introducing the vaccine into her body would have had serious deleterious effects on her immune system and her health. JA87, JA99, JA100, JA120-25. At no time did Dr. Lam or APL produce any evidence that she and her treating doctor were wrong about these concerns.

14

**A.    THE DISTRICT COURT ERRED IN HOLDING, AS A MATTER OF LAW, THAT TARQUINIO WAS RESPONSIBLE FOR THE BREAKDOWN IN THE INTERACTIVE PROCESS.**

The District Court explained that it was dismissing Count I because Tarquinio had caused a breakdown in the interactive process required under the ADA for providing reasonable accommodations:

> Here, Plaintiff declined to sign the medical release form…. Defendant attempted in good faith to participate in the interactive process … but Plaintiff refused to participate.

JA289.  The District Court erred when it found that APL acted in good faith and that Tarquinio refused to participate.  The record evidence contradicts these factual findings, creating a dispute as to a material fact.

The ADA prohibits a covered employer from discriminating against a "qualified individual on the basis of disability in regard to…the discharge of employees[.]" 42 U.S.C. § 12112(a).  Unlawful discrimination by an employer on account of one's disability includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." *Id.* at (b)(5)(A).  To establish a prima facie claim for failure to accommodate, an employee must show (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer

15

refused to make such accommodations. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (cleaned up).

The District Court did not call into question whether Tarquinio's Chronic Lyme and Lyme-induced Immune Dysregulation constitute a disability within the meaning of the ADA. JA281-92. It is undisputed that Tarquinio put her employer on notice of her disability in a timely fashion. JA99, JA100. It is also undisputed that Tarquinio's vaccination status did not prevent her from performing the essential functions of a Systems Engineer. JA56. Therefore, only the fourth element of Tarquinio's failure to accommodate claim is relevant to the dismissal of Count I.

Implicit in the fourth element is the requirement that the employer and the employee engage in an "interactive process" to determine a reasonable accommodation. *Haneke v. Mid-Atl. Cap. Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005). Both employer and employee have a duty to engage in the interactive process in good faith. *Id.*; *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). If the employer causes a breakdown in the interactive process or operates in bad faith, then the employer may be liable under the ADA and if the employee causes a breakdown in the interactive process or operates in bad faith then the employer will not be liable. Put differently, the Court should, through assessing the factual record, "attempt to isolate the cause of the breakdown and then assign responsibility." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314,

16

323 (4th Cir. 2011) (quoting *Beck*, 75 F.3d at 1135). Thus, the issue of who caused the breakdown in the interactive process is a fact intensive analysis.

When the record reveals a genuine issue of material fact regarding who caused the breakdown in the interactive process or whether the parties met their duty of good faith, the Court should not, at the summary judgment stage, decide who caused the breakdown or who acted in bad faith. *Haneke*, 131 F. App'x at 400. Additionally, at the summary judgment stage the District Court must draw all inferences and view the evidence in the light most favorable to the nonmoving party. *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 324 (4th Cir. 2012); *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015).

Here, the District Court erred by weighing the evidence and finding in favor of APL on the failure to accommodate claim. JA289-90. First, there was significant evidence from which a trier of fact could conclude that APL failed to engage in the interactive process or failed to operate in good faith. JA169, JA224. Second, the District Court made multiple key factual holdings that were contradicted by substantial evidence. JA281, JA288. Third, the District Court relied on the fact that Tarquinio did not sign an overly broad and intrusive medical release form as evidence she caused the breakdown in the interactive process. JA289. Fourth, the District Court erroneously faulted Tarquinio for only being willing to accept "her

17

preferred choice of accommodation" when APL refused to offer any accommodation of any kind.  JA289-90.

When the District Court's errors are viewed in conjunction with one another, the conclusion that APL caused the breakdown in the interactive process is sufficiently bolstered and the conclusion that Tarquinio caused the breakdown in the interactive process is sufficiently rebutted so that, at a minimum, there is a genuine issue of material fact regarding who caused the breakdown in the interactive process.

### 1.    There is substantial evidence that APL caused the breakdown in the interactive process.

When an employee proposes a particular accommodation, the employer must at least consider it or the employer can be found to have failed to engage in the interactive process.  In *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 600-601 (6th Cir. 2018) the plaintiff experienced medical complications from a pregnancy and requested to work from home for the ten weeks she was on bed rest.   The employer, citing its policy against employees working from home, denied the request and required the employee to use a combination of sick leave under the FMLA and short-term disability.  *Id.* at 601.  The employer argued that its accommodation was reasonable.  *Id.* at 605.  The Sixth Circuit upheld the ruling in the plaintiff's favor on the failure to accommodate claim, in part, because the employer never considered making an exception to the in-person work rule.  *Id.* at 605-606.  In short, an employer engaging in the interactive process is required to

18

consider the employee's request.  *E.E.O.C. v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1110 (9th Cir. 2010).  *See also Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142, 162 (3d Cir. 1999)*, and Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 219 (2d Cir. 2001) (both holding an employer demonstrates good faith engagement in the interactive process by showing some sign of having considered the employee's request and offering and discussing available alternatives with the employee).

Here, APL denied the accommodation request because it concluded that Lyme Disease was not a contraindication to the vaccine.  JA166, JA169.  That is not engaging in an interactive process.  Like, in *Mosby-Meachem*, 883 F.3d at 605-06, APL made statements that revealed it unilaterally determined that Tarquinio's condition did not warrant an exemption from the vaccine mandate and, as a result, was unwilling to consider her requested accommodation.  JA169.  For example, in response to Tarquinio providing bloodwork that showed, at a minimum, immune deficiency and a possible infection, JA245, JA255, APL told Tarquinio it did not matter whether Tarquinio could substantiate her condition with medical records because APL had determined that Lyme Disease was not a CDC approved contraindication.  JA169.  Thus, the District Court erred when it held that Tarquinio was at fault for not engaging in the interactive process.  JA289-90.  A reasonable jury could conclude that it was APL that was not engaged in the process or, at a minimum, that further interaction by Tarquinio was futile and irrelevant.

The District Court's factual determination that Tarquinio caused the breakdown is also an error because the undisputed evidence shows that Tarquinio put forth two separate substantive accommodation proposals on October 14, 2021, and on November 15, 2021. JA120, JA125. The District Court ignored these facts when it described Tarquinio's position as demanding only a "blanket exemption." Tarquinio was flexible and creative in proposing alternate solutions. JA290. She stated that, in lieu of taking a COVID vaccine, she would take a weekly COVID test and would work remotely multiple days per week. JA120, JA125. Tarquinio even offered to pay for the COVID tests herself. JA120. Despite the interactive process requiring APL to consider Tarquinio's request, *UPS Supply Chain Sols.*, 620 F.3d at 1110, there is no record of APL considering Tarquinio's specific accommodation requests internally and there is no record of APL responding to Tarquinio regarding those requests and explaining why they were unacceptable. Additionally, there is no record of APL discussing whether Tarquinio's two accommodation requests would present an undue hardship. After all, Tarquinio was permitted to work at the office for eighteen months unvaccinated, doing APL's bidding without incident, and it was only when the vaccines became available that APL suddenly came to the medically unsupported view that Tarquinio's job could not be performed by an unvaccinated individual. JA208. JA232.

The record evidence reasonably supports the view that APL caused the breakdown in the interactive process because APL officials always referred to her condition as Lyme Disease rather than Chronic Lyme or Lyme Induced Immune Dysregulation. JA166, JA224, JA228. The only time an APL official appeared to reference Chronic Lyme or Lyme-induced Immune Dysregulation, the terms are found in quotation marks and then APL immediately reverted to referring to her condition imprecisely as Lyme disease. JA166. Tarquinio referred to her diagnosis using the correct language multiple times during the interactive process, but APL refused to use this language. JA99, JA120, JA125. This is not a mere matter of semantics. Tarquinio did not have an active Lyme infection. JA09. By switching the name of the disease, APL was creating a strawman—of course Tarquinio should be denied accommodation because she did not have Lyme Disease. But Tarquinio never claimed she was suffering from an active Lyme infection—she claimed she was suffering from the long-term consequences of an earlier Lyme infection. JA99, JA120. This unilateral change of the claimed disability demonstrates bad faith on the part of APL and a lack of understanding by APL's medical consultant, Dr. Lam.

## 2. The District Court erred when it made at least two key factual findings at the summary judgment stage that were contradicted by evidence in the record.

At the summary judgment stage, the District Court must view the evidence and make all inferences in the light most favorable to the nonmoving party. *Dulaney*,

673 F.3d at 324. The Court also cannot weigh evidence or make credibility determinations. *Jacobs*, 780 F.3d at 569. In the face of conflicting evidence, summary judgment is not appropriate because it is the fact-finder's function to resolve factual disputes. *Angelini v. Baltimore Police Dep't*, 464 F. Supp. 3d 756, 776 (D. Md. 2020). A reversal of a district court's grant of summary judgment is appropriate when the court did not credit evidence that contradicted some of its key factual conclusions. *Jacobs*, 780 F.3d at 569 (quoting *Tolan v. Cotton*, 572 U.S. 650, 657 (2014)).

Here, despite substantial evidence to the contrary, the District Court made the following two key factual findings: (1) that Tarquinio provided no timely medical records, and (2) that Tarquinio refused to participate in the interactive process. JA282, JA289. The conflicting evidence should have prevented the District Court from making these key factual findings and then relying on them in granting summary judgment.

Contradicting the District Court's first factual finding, that Tarquinio provided no timely medical information, is the evidence that Tarquinio provided a timely medical verification form to support her accommodation request signed by Dr. Schwartz. JA100. With that medical verification form, Tarquinio also provided a written statement causally relating her condition to her requested accommodation by explaining that taking a COVID vaccine could introduce an antigen into her body

22

causing a negative immune response because of her history of immune dysregulation and Chronic Lyme. JA99. With those two documents, Tarquinio also submitted documents demonstrating that she was diagnosed with Lyme disease in 2012. JA73, JA102. Tarquinio submitted her 2012 bloodwork to show that she previously had Lyme Disease and scholarly medical articles to show that Lyme Disease can cause Chronic Lyme and Immune Dysregulation. JA70-71, JA73, JA192, JA284. Additionally, on December 3, 2021, Tarquinio provided current bloodwork that showed her CD57 levels were low, which is indicative of immune deficiencies, and she explained that CD57 levels are used as a screening mechanism by Lyme Disease specialists. JA169, JA245, JA255. Additionally, Tarquinio provided in depth summarizations of her long medical journey with Chronic Lyme and Lyme-induced Immune Dysregulation that detailed, among other things, the process she took to find effective specialists, a reiteration of the causal connection between her condition and her requested accommodation, the events leading to her seeking medical treatment for her condition, and the treatments that helped her return to health. JA120-25. APL has not alleged that there were specific records it needed from Tarquinio to comply with a federal regulation or even the executive order it cites as one of the catalysts for the vaccine mandate. JA173. Although Dr. Lam apparently did not agree with Dr. Schwartz, APL did not demand that a third doctor resolve the

difference of opinion.  *See* procedures under the Family and Medical Leave Act, 29 U.S.C. § 2613(c).

As for the second faulty factual finding by the District Court, that Tarquinio refused to participate in the interactive process, the record contains sufficient evidence for a reasonable trier of fact to find that Tarquinio actively participated in the interactive process.   For example, Tarquinio put forth two specific accommodations proposals that would enable her to avoid the COVID vaccine. JA120, JA125.  However, APL failed to acknowledge or respond to these proposals. Tarquinio's accommodation proposals also described her medical journey with her condition and further informed APL of her medical situation and evinced her participation in the interactive process.  *Id.*  Tarquinio also provided updated medical documentation after APL requested updated medical information.  JA169.  She tried to quickly get an appointment with Dr. Sivieri, which failed due to time constraints, but she managed to speak with a physician's assistant at his office.  JA73, JA253, JA255.   The physician's assistant then ordered bloodwork, which Tarquinio provided.   JA248-49, JA169.   Tarquinio was proactive and responsive in her participation during the interactive process.

The District Court erroneously made these key factual findings despite evidence to the contrary.  There is a genuine dispute of material facts that should have precluded the entry of summary judgment.

24

> **3.     The medical release form that APL demanded Tarquinio sign was overly broad and intrusive, making it an unlawful medical inquiry under the ADA. Consequentially, the District Court erred when finding Tarquinio's refusal to sign the unlawful medical release form was evidence that she caused the interactive process to breakdown.**

The E.E.O.C. guidelines describe the medical information that can be requested by an employer once an employee requests a reasonable accommodation:

> An employer may require an employee to provide documentation that is **sufficient** to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested but cannot ask for unrelated documentation.  This means that, in most circumstances, an employer cannot ask for an employee's complete medical records because they are likely to contain information unrelated to the disability at issue and the need for accommodation.

E.E.O.C., *Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act*, at Question No. 10 (emphasis in original).  Medical inquiries must not be "broader or more intrusive than necessary." *Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 339 (4th Cir. 2022)

When an employer makes a medical inquiry regarding an employee's condition, the employer may not require a medical release form that is overly broad or one that is not limited to the employee's specific medical condition at issue.  *See E.E.O.C. v. Blue Sky Vision, LLC*, No. 1:20-CV-285, 2021 WL 5535848, at *8-9 (W.D. Mich. Nov. 1, 2021) (holding employer could require the optometrist-

employee to submit to a medical examination after learning of his eye condition, but that there was a genuine issue regarding whether the employer properly limited the scope of the accompanying medical release to only the relevant condition); *Nawara v. Cnty. of Cook*, No. 17 C 2393, 2019 WL 1399972, at *7 (N.D. Ill. Mar. 28, 2019) (broad medical release forms that were "untailored for any specific type of fitness for duty exam" could support an ADA claim under § 12112(d)(4)); *James v. Goodyear Tire & Rubber Co.*, 354 F. App'x 246, 249 (6th Cir. 2009) (fitness for duty exam of a current employee must "remain appropriately narrow" in scope).

Here, the medical release form that APL demanded Tarquinio sign was not limited to her Chronic Lyme and Lyme-induced Immune Dysregulation nor was it limited to information needed to determine an appropriate accommodation based on her request. JA278. The form had no stated limits regarding the medical conditions, duration, or the identity of the physicians to whom it would be sent. *Id.* The unlimited scope of the medical release form shows it was overly broad and in violation of § 12112(d)(4) and the Privacy Rule of HIPAA. 45 C.F.R. § 164.508(c). Like in *Blue Sky Vision*, 2021 WL 5535848, at *8-9, where the employer could lawfully require the optometrist-employee to submit to a fitness for duty exam but could not require the employee to sign a medical release form that was not limited to the specific condition that motivated the fitness for duty exam, APL cannot require

Tarquinio to sign a medical release form that was not limited to her specific disability. JA278.

In *Coffey,* the Fourth Circuit made clear that a medical inquiry must not be overly broad or more intrusive than necessary. 23 F.4th at 339. A blank medical release form that is unlimited in its scope is the quintessential overly broad and intrusive medical inquiry that the ADA proscribes. There is at least a genuine issue of material fact regarding whether the form was unlawful. If the form was unlawful then Tarquinio's refusal to sign it should not serve as evidence that she acted in bad faith during the interactive process.

### 4. The District Court erroneously faulted Tarquinio for not accepting an ineffective accommodation.

The District Court faulted Tarquinio for only accepting her "preferred choice of accommodation." JA289. The Court wrote:

> Plaintiff's argument that the only reasonable accommodation possible is a blanket exemption from the Vaccination Policy is unavailing… Employers are not obligated to provide the employee's choice of accommodation so long as the provided accommodation is reasonable.

(Emphasis added). The District Court's justification for its decision is a *non sequitur.* APL never offered an accommodation, much less a reasonable accommodation. Therefore, any attempt to compare Tarquinio's proposed accommodation to APL's proposed accommodation is impossible.

27

Under the ADA, any accommodation that an employer provides must be effective as the term "accommodation" requires effectiveness. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 399 (2002). *See also Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89 (2d Cir. 2015) (holding employer can only choose between effective accommodations); *UPS Supply Chain Sols.*, 620 F.3d at 1110 (holding interactive process requires employer to offer an accommodation that is reasonable and effective).

Here, APL offered no accommodation of any kind. According to Tarquinio's treating doctor, APL's rejection of Tarquinio's proposed accommodation would have posed a serious risk to her health. In short, there is sufficient evidence for a jury to find that APL did not engage in good faith in the interactive process when considering Tarquinio's exemption request. It offered no accommodation because it did not believe she needed one. APL threatened that she either be vaccinated or she would be fired. APL carried out that threat without considering reasonable alternatives.

**B.  THE DISTRICT COURT ERRED IN HOLDING THAT TARQUINIO'S TERMINATION WAS NOT BECAUSE OF HER DISABILITY.**

**1.  The District Court made an impermissible distinction between APL terminating Tarquinio because of her disability and terminating her because she could not comply with an APL employment standard because of her disability.**

With regard to Count II (disability discrimination in violation of the ADA),
the District Court explained that, in its view, Tarquinio was not fired "because of her
disability."  The District Court wrote:

> Here, Plaintiff fails to show that she was fired for her alleged disability.
> Instead, Plaintiff was fired because of her failure and refusal to comply
> with the company vaccine policy.

JA291.  The District Court's reasoning is illogical.  Tarquinio's disability was
indivisible with her refusal to comply with the vaccine policy.  She refused to comply
solely and directly because of her disability.  JA99, JA100, JA120-25.

The ADA, 42 U.S.C. § 12112(b)(3)(A), states that unlawful discrimination by
an employer on the basis of one's disability includes utilizing standards, criteria, or
methods of administration that have the effect of discrimination on the basis of
disability.   Subsection 12112(b)(6) states that unlawful discrimination by an
employer on the basis of one's disability also includes "using qualification
standards…or other selection criteria that screen out or tend to screen out an
individual with a disability[.]" Therefore, terminating an employee because she
cannot comply with an employment standard, such as a vaccine mandate, due to her
disability, is discrimination "because of her disability." *See Bates v. United Parcel
Serv., Inc.*, 511 F.3d 974, 994 (9th Cir. 2007) (holding employer's mandated hearing
exam screened out hearing impaired individuals constituting discrimination
"because of disability").

29

Here, the District Court wrongly concluded that Tarquinio was not fired "because of her disability." The District Court failed to see that terminating an employee because she cannot comply with an employment standard due to her disability is discrimination "because of her disability." JA290. Like in *Bates*, where the Court found that a hearing exam that screened out hearing-impaired individuals constituted discrimination because of their disability, APL's vaccine mandate screens out workers with Chronic Lyme and Lyme-induced Immune Dysregulation. JA166.

**2.    The District Court failed to analyze whether APL's vaccine mandate was job-related and consistent with business necessity or whether Tarquinio posed a "direct threat" to other employees.**

The District Court made conclusory statements holding that APL's vaccine mandate was acceptable because it "was put in place to protect the public safety of all employees." This appears to be an allusion to the "direct threat" defense. JA292. The Court made no mention of whether the vaccine mandate was job-related and consistent with business necessity. *Id.* The Court's reasoning ignored the fact that an employer is not free to impose any and all medical standards as a qualification for the job. The ADA imposes stringent requirements upon an employer's use of medical standards.

Under both 42 U.S.C. § 12112(b)(3) and (b)(6), to avoid liability, an employer must prove either that the qualification is job-related and consistent with business necessity or prevents an employee from creating a "direct threat" to the health or

safety of others in the workplace. *See also* 29 C.F.R. § 1630.7; 29 C.F.R. § 1630.15(b)(2); *Bates*, 511 F.3d at 995 (holding that employer must show that its mandated hearing test, which screened out hearing impaired employees, was job-related and consistent with business necessity).

For a qualification standard to be job-related and consistent with business necessity, the standard must measure the individual's ability to perform the essential functions of her job. *Bates*, 511 F.3d at 996; *Williams v. ABM Parking Servs. Inc.*, 296 F. Supp. 3d 779, 790 (E.D. Va. 2017). An employer claiming the business necessity defense must demonstrate that the medical qualification standard is related to the specific skills and physical requirements of the position in question. *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1035 (8th Cir. 2020). ADA regulations define the term "essential functions" as the "fundamental job duties of the employment position the individual with a disability holds[.]" The term does not include marginal functions of the position. 29 C.F.R. § 1630.2(n). Moreover, the business necessity standard requires that the employment standard in question "substantially promotes the business's needs." *Atkins v. Salazar*, 677 F.3d 667, 682 (5th Cir. 2011). The business necessity standard is "quite high" and not to be confused with mere expediency. *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001).

For a medical-based qualification standard to be justified as necessary to address a "direct threat" to the health and safety of other employees, the employer

must make an individualized assessment of the individual's ability to safely perform the essential functions of the job. 29 C.F.R. § 1630.2(r). For an employee to constitute a "direct threat" there must be evidence that she presents a "significant risk of substantial harm to the health or safety of the individual or others *that cannot be eliminated or reduced by reasonable accommodation*." *Id.* (emphasis added).

Here, the Court made an unsupported finding of fact that unvaccinated APL employees, including Tarquinio, constituted a "direct threat" to others in the workplace. JA291-292. The Court's holding is demonstrably false as evinced by the fact that APL approved numerous employee exemption requests from the vaccine mandate. JA273. For one to present a "direct threat" to other APL employees due to her unvaccinated status, thus justifying terminating the disabled individual unable to get vaccinated, APL must show that the risks stemming from the unvaccinated status could not be eliminated or reduced by reasonable accommodation. 29 C.F.R. § 1630.2(r). The District Court found that APL had a good motive—it wanted to protect the "public safety of all employees, including Plaintiff." JA292. But the District Court did not engage in that analysis of whether there was a middle ground—a reasonable accommodation. APL allowed numerous employees to continue working while unvaccinated and there was nothing special about Tarquinio's job that made her different. JA273. Eighteen months of working at APL without vaccination also contradicts the contention that she posed a direct threat to

her co-workers.  JA208.  If she was that dangerous, APL could have told her to work from home, like many of her co-workers.

There is a genuine issue of material fact regarding whether Tarquinio was fired because of her disability or because of her refusal to be vaccinated.  In Tarquinio's view, those choices are one and the same but, at a minimum, the trier of facts should be allowed to decide this, not the Court at the summary judgment stage.

### C.    THE DISTRICT COURT ERRED IN HOLDING THAT THE EMPLOYER'S MEDICAL INQUIRIES WERE LAWFUL AND JUSTIFIED.

When dismissing Count III, the District Court explained:

> Here, Defendant's medical inquiry was clearly job-related as it dealt entirely with Plaintiff requesting a medical accommodation for APL's vaccination policy.

JA292.  The record below shows that APL made numerous medical inquiries related to Tarquinio's disability.  First, it required her to disclose whether she had been vaccinated.  Second, it sought detailed information about her Chronic Lyme and Lyme-induced Immune Dysregulation.  Third, it sought information about the Lyme Disease she contracted ten years earlier.  Fourth, it demanded she sign an overly broad medical release form.  In Count III, the question is whether APL's inquiries stepped over the line.

The District Court erred because it held that Tarquinio's request for a medical accommodation caused APL's medical inquiries to be job-related and consistent

with business necessity. *Id.* The job-related analysis must be conducted in view of the essential functions of the employee's job, not the policy, the vaccine mandate, that the employer puts in place. *Bates*, 511 F.3d at 996.

An employer "may not discriminate on the basis of disability" and "the prohibition against discrimination … shall include medical examinations and inquiries." 42 U.S.C. §§ 12112(a) and (d)(1). An employer "shall not make inquiries of an employee as to whether such employee is an individual with a disability… unless such … inquiry is shown to be job-related and consistent with business necessity." *Id.* § 12112(d)(4)(A). The Supreme Court has already ruled that vaccination against COVID is not inherently job-related:

> That is not to say OSHA lacks authority to regulate occupation-specific risks related to COVID–19. Where the virus poses a special danger because of the particular features of an employee's job or workplace, targeted regulations are plainly permissible. We do not doubt, for example, that OSHA could regulate researchers who work with the COVID–19 virus. So too could OSHA regulate risks associated with working in particularly crowded or cramped environments. But the danger present in such workplaces differs in both degree and kind from the everyday risk of contracting COVID–19 that all face. OSHA's indiscriminate approach fails to account for this crucial distinction—between occupational risk and risk more generally—and accordingly the mandate takes on the character of a general public health measure, rather than an "occupational safety or health standard." 29 U.S.C. § 655(b).

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665–66 (2022) (emphasis added). Due to the nature of Tarquinio's

job, she had no greater chance of spreading COVID than the general public. Her job duties did not bring her into contact with immunocompromised medical patients, as might be the case with nurses and doctors. The vaccine arguably related to public health, but it did not relate to Tarquinio's job duties.

The ADA contains both a prohibition and a permission related to medical inquiries. It prohibits medical inquiries that are not job-related and consistent with business necessity but permits two types of inquiries:

> A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

42 U.S.C. § 12112(d)(4)(B). Using the rule of statutory construction, *expressio unius est exclusio alterius*, Congress intended that other forms of inquiries are prohibited. The regulations promulgated under the ADA support this interpretation. 29 C.F.R. § 1630.14(c) governs medical inquiries of current employees and prohibits them unless they are job-related and consistent with business necessity: "A covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity." The only other inquiries related to current employees that are permitted by the ADA's regulations are voluntary or arise out of objective concern related to an employee's fitness for duty. Obviously,

35

such examinations and inquiries would involve an analysis of the employee's duties and job description.

The ADA's prohibition regarding medical inquiries is directly linked to whether the employee may perform job-related functions. Thus, for example, an employer is not permitted to ask employees or job applicants whether they are on birth control, whether they are pregnant, whether they have undergone heart surgery, whether they are on anti-viral medications, etc.—unless the employer can show that the inquiry pertains to a job-related function. Even though these types of inquiries do not necessarily expose a disability, they are not job-related and consistent with business necessity and are, thus, prohibited. In the case of Tarquinio, her vaccination status had nothing to do with her job duties. She had been performing well for the first eighteen months of the pandemic without the vaccination and no one ever questioned her job performance. In fact, she was promoted during the pandemic. JA54.

If an employer contends that a medical inquiry is needed it must comply with § 12112(d)(4)(A). The employer must show "(i) that the asserted 'business necessity' is vital to the business, (ii) that the examination genuinely serves the business necessity, and (iii) that the request is no broader or more intrusive than necessary." *Blake v. Baltimore Cty.*, 662 F. Supp. 2d 417, 422 (D. Md. 2009); *see also Conroy v. New York State Dept. of Corr. Services*, 333 F.3d 88, 97-98 (2d Cir.

36

2003); *Coffey*, 23 F.4th at 339; *Coursey v. Univ. of Maryland E. Shore*, No. CIV. CCB-11-1957, 2013 WL 1833019, at *5 (D. Md. Apr. 30, 2013), aff'd, 577 Fed. Appx. 167 (4th Cir. 2014).

The business necessity analysis must factor in the specific workplace that the employee is operating within and the essential functions of a person's specific role. *Conroy*, 333 F.3d at 99-100; *Harris*, 953 F.3d at 1135; *Coffey*, 23 F.4th at 339-40; (holding that inquiry into employee's amphetamine and codeine use was job-related and consistent with business necessity because it implicated his ability to operate a train); *Hannah P. v. Coats*, 916 F.3d 327, 339 (4th Cir. 2019) (demonstrating that whether attendance at a physical workplace is an essential function of a job so as to cause inquiries implicating attendance to be "job-related and consistent with business necessity" depends on the specific job).  Moreover, whether an inquiry is job-related and consistent with business necessity is an objective inquiry and the covered entity has the burden of proof to show the standard has been met.  *Coffey*, 23 F.4th at 339; *Fredenburg v. Contra Costa Cnty. Dep't of Health Servs.*, 172 F.3d 1176, 1183 (9th Cir.1999); *Davenport v. Michelin N. Am., Inc.*, 2012 WL 5381193, at *3 (D.S.C. 2012), report and recommendation adopted, 2012 WL 6212517 (D.S.C. Dec. 13, 2012).  The business necessity standard is "quite high" and is not to be confused with "mere expediency."  *Cripe*, 261 F.3d 877 at 890.

The fallacy in the District Court's reasoning is that the Court assumes the employer can create job-relationship by simply promulgating a new policy. The District Court ignored the fact that the new policy must, itself, be job-related and consistent with business necessity. For example, an employer cannot mandate that all employees disclose their birth control methods and, when an employee objects, argue that the policy is in place and, therefore, medical inquiries about compliance with the policy or about accommodations from the policy are, thereby, job-related. Although this example may seem apocryphal, it is precisely what the District Court held was permissible here—the employer was allowed to issue a medically related policy and then argue that medical inquiries related to compliance and accommodations were job-related. The obvious objection is that the underlying policy does not relate to the employee's ability to do her job, whether the policy relates to birth control or vaccination. Thus, follow-up medical inquiries regarding compliance with or accommodations from the underlying policy cannot be job-related and consistent with business necessity unless the policy is job-related.

Even assuming arguendo that the vaccine mandate was a lawful policy, APL's blanket medical release form was overly broad and intrusive and thus was not consistent with business necessity and was unlawful. JA278. *Coffey*, 23 F.4th at 339. The District Court's grant of summary judgment in favor of APL regarding Tarquinio's unlawful medical inquiry claim must be overruled.

## VI.    CONCLUSION

The District Court's decision to grant summary judgment in APL's favor as to each of Tarquinio's three ADA counts must be overruled.  As for Count I, failure to accommodate, the District Court made factual findings at the summary judgment stage that were contradicted by substantial evidence in the record and relied on those erroneous factual findings to bolster the conclusion that Tarquinio was at fault for the interactive process.  As for Count II, the employment discrimination claim, the District Court erroneously made a factual finding that Tarquinio was fired for noncompliance rather than because of her disability.   As for Count III, the unlawful medical inquiry claim, the District Court failed to analyze whether the COVID vaccine mandate was job-related and consistent with business necessity within the context of Tarquinio's specific job-duties and workplace.  The Court also failed to scrutinize the unlimited scope of the medical release form that APL required Tarquinio to sign.  These substantial errors require reversal.

## VII.    STATEMENT REGARDING ORAL ARGUMENT

Tarquinio hereby requests the opportunity to present oral argument.  The issues in this case have wide-ranging impact and have been subjected to few, if any, appellate court decisions.  The Fourth Circuit and the Supreme Court have levied little binding law regarding the breakdown of the interactive process and the ADA liability that follows.  Additionally, neither the Fourth Circuit nor the Supreme Court

has decided whether a private employer may demand employees to reveal their vaccination status to their employer or what specific details regarding a specific job title enable the employer to make such a demand. In the event that a mandate can be imposed, the Fourth Circuit and the Supreme Court have also not decided the extent to which an employee may refuse to comply with a COVID vaccine mandate imposed by a private employer. This is a case of first impression.

<div style="margin-left:auto;width:60%">

Respectfully submitted,
**KSC L**AW

By:_____/s/_____
Francis J. Collins, Esq.
201 N. Charles Street, Tenth Floor
Baltimore, Maryland 21201
(410) 244-1010 (telephone)
(410) 244-8001 (fax)
AIS No. 8501010118
Fed Ct. # 04272
fjcollins@kscadvocates.com

</div>

40

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 24-1432        Caption: Tarquinio v. Johns Hopkins Univ. Applied Physics Lab

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief  may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✔] this brief or other document contains ___9284___ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[ ] this brief or other document has been prepared in a proportionally spaced typeface using
MS Word_____ [*identify word processing program*] in
_____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Francis J. Collins, Esq._____

Party Name Sally Tarquinio_____

Dated: 8/23/2024_____

04/12/2020  SCC

41