CASE NO. 24-1432

IN THE
UNITED STATES COURT OF APPEALS
FOR THE
FOURTH CIRCUIT

---

SALLY TARQUINIO,

*Appellant-Plaintiff,*

**vs.**

JOHNS HOPKINS UNIVERSITY APPLIED PHYSICS LAB

*Appellee-Defendant.*

---

On Appeal from the United States District Court for the District of Maryland
Civil Action No. 1:23-cv-00727-RDB
(The Honorable Richard D. Bennett, presiding)

---

**REPLY BRIEF OF APPELLANT**

---

Francis J. Collins, Esq.
KSC Law
201 N. Charles St., Tenth Floor
Baltimore, Maryland 21201
Fed Bar # 04272
AIS # 8501010118
fjcollins@kscadvocates.com
410-244-1010
Attorney for Appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................i

I.    INTRODUCTION ..............................................................................1

II.   AN EMPLOYER MAY NOT DECLARE THAT VACCINATION AGAINST
      COVID-19 IS JOB-RELATED AND CONSISTENT WITH BUSINESS
      NECESSITY WITHOUT FIRST CONSIDERING THE JOB DUTIES OF
      THE EMPLOYEE REFUSING THE VACCINATION. ...............................3

III.  THE INTERACTIVE PROCESS BROKE DOWN BECAUSE APL AND
      DR. LAM IMPOSED UNLAWFUL DEMANDS ON TARQUINIO. ...........6

IV.   TERMINATING TARQUINIO BECAUSE SHE WOULD NOT COMPLY
      WITH APL'S VACCINATION POLICY BECAUSE OF HER DISABILITY
      IS EQUIVALENT TO TERMINATING TARQUINIO BECAUSE OF HER
      DISABILITY. ..............................................................................12

V.    THE DISTRICT COURT ERRED IN CREDITING "PUBLIC SAFETY"
      CONCERNS WHEN THERE WAS NO EVIDENCE IN THE RECORD
      THAT TARQUINIO CONSTITUTED A "DIRECT THREAT" TO HER CO-
      WORKERS OR OTHERS..............................................................14

VI.   CONCLUSION..............................................................................15

# TABLE OF AUTHORITIES

**Cases**

Holmes v. Gen. Dynamics Mission Sys. 838 Fed. App'x 6889 (4th Cir. 2020)........5

Jorgenson v. Conduent Transp. Sols., Inc., 2023 WL 1472022 (D. Md. Feb. 2, 2023), aff'd, 2023 WL 4105705 (4th Cir. 2023).............................................................13

Lashley v. Spartanburg Methodist Coll., 66 F.4th 168 (4th Cir. 2023).....................9

Mays v. Bd. of Com'rs Port of New Orleans, 2015 WL 6605545 (E.D. La. Oct. 29, 2015) ................................................................................................................11

Monterroso v. Sullivan & Cromwell, LLP, 591 F. Supp. 2d 567 (S.D.N.Y. 2008) .12

Rowlett v. Baltimore City Police Dep't, 2023 WL 2664232 (D. Md. 2023) ............9

**Statutes**

29 C.F.R. § 1630.2(r) ............................................................................................15

# APPELLANT'S REPLY BRIEF

## I.    INTRODUCTION

No matter how frequently and how strenuously APL argues that its vaccination policy was good for public safety, job-related, and consistent with business necessity, it cannot avoid the fact that it never considered the specific job duties of Tarquinio in making that assessment. The District Court made the same mistake. It failed to consider whether the vaccine affected Tarquinio's ability to perform the essential functions of her position. It found that the vaccine mandate was imposed to protect "public safety." JA292. But the District Court erred when it failed to consider the specific job duties of Tarquinio. What is clear is that the Court assumed the vaccine was job-related because of APL's *ipse dixit*. Vaccination was job-related because APL declared it to be. But without an examination of Tarquinio's job duties, this cannot stand.

The District Court explicitly granted summary judgment because it found, as a fact, that Tarquinio was at fault for causing a breakdown in the interactive process. However, the District Court put the proverbial cart before the horse. The interactive process must sequentially follow a finding that, given the specifics of Tarquinio's job duties, the vaccine mandate was job-related and consistent with business necessity. Until that initial determination is made there is no need to delve into the interactive process.

1

APL argues that it had the right to have its in-house medical director, Dr. Clarence Lam, speak to Tarquinio's doctor, debate the merits of her medical condition and diagnosis and, only then, be required to resolve her accommodation request. APL is incorrect. In order to speak to her doctor, APL's medical director needed a signed medical authorization from Tarquinio. However, the ADA does not give an employer access to an employee's entire medical history. The authorization form APL demanded was unlimited in scope, time, and method. JA278. Tarquinio's refusal to sign the authorization form was justified and should not have been considered a refusal to engage in the interactive process. Indeed, from these facts a reasonable jury could infer that APL caused the breakdown.

Any medical inquiry that an employer makes must be job-related and consistent with business necessity. Here, the District Court concluded that APL's inquiries were job-related because they dealt with APL's vaccine mandate. The problem with the District Court's conclusion is that it is based on the same *ipse dixit* described above. The medical inquiry is only relevant because APL demanded that Tarquinio be vaccinated but APL never established that the vaccination was job-related and consistent with business necessity. Therefore, there is no reason to believe that the medical inquiry is job-related and consistent with business necessity.

II.   **AN EMPLOYER MAY NOT DECLARE THAT VACCINATION AGAINST COVID-19 IS JOB-RELATED AND CONSISTENT WITH BUSINESS NECESSITY WITHOUT FIRST CONSIDERING THE JOB DUTIES OF THE EMPLOYEE REFUSING THE VACCINATION.**

An employer may not inquire into the medical procedures its employees receive or impose a vaccine mandate on its unwilling employees unless the employer carries its burden to show that the medical procedures or vaccine is job-related and consistent with business necessity.

Tarquinio had been performing her duties competently and faithfully for many years and during the first eighteen months of the pandemic. The sudden approval of vaccines by the U.S. Food and Drug Administration did not change her duties and did not change the disease mitigation measures that were otherwise available.

Tarquinio submitted a verification form from her treating doctor that she should not receive the COVID-19 vaccine. JA100. Dr. Lam ignored that verification. He stated that "there is no evidence that Lyme disease should affect an individual's ability to be vaccinated…" JA228. In fact, there was conclusive evidence already before him—the signed verification from Tarquinio's treating physician. What Dr. Lam demanded was, essentially, a double-blind study of individuals with Chronic Lyme and/or Lyme-induced Immune Dysregulation, that showed sufficient negative outcomes for him to be convinced that the cost-benefit analysis justified an exemption from vaccination. Obviously, at that stage of the

3

pandemic, no such studies were available and Dr. Lam's skepticism was impossible to cure.

Dr. Lam demanded that Tarquinio and her doctor educate him about Chronic Lyme and Lyme-induced Immune Dysregulation and the reasons these conditions created a contraindication from vaccination.  JA224.  Dr. Lam admitted that he was not a specialist in immunology.  JA218.  In effect, it was Dr. Lam's position that, if Tarquinio could not convince him that the vaccination created a serious risk because of her condition, APL should ignore her doctor's verification and should deny her an exemption.   But the reverse was also true—APL and Dr. Lam failed to present any evidence that vaccination was safe for individuals with "Chronic Lyme and Lyme-induced Immune Dysregulation."   Without definitive medical evidence that affirmatively established the safety and efficacy of the vaccine in the context of a patient with Tarquinio's conditions, Dr. Lam was not justified in contradicting the medical advice of a specialized treating doctor.  This was especially true when, given Tarquinio's job duties, there was no benefit to APL from vaccination and Tarquinio did not pose a direct threat to co-workers.

Dr. Lam illegally reversed the burden of proof.  Once Tarquinio presented a signed verification by a qualified and licensed physician, APL was bound to grant the exemption unless it could show that the verification was fraudulent, or at least

wholly mistaken. APL and the District Court erred by shifting the burden to Tarquinio to do more than present a verification from a qualified doctor.

In footnote 4 APL cites *Holmes v. Gen. Dynamics Mission Sys.* 838 Fed. App'x 6889, 691 (4th Cir. 2020) for the proposition that an employee who cannot comply with a workplace policy "is not considered a qualified individual for ADA purposes." This is a misreading of the holding. In that case, the Plaintiff could not comply with a safety policy that was directly related to the essential functions of her position. Indeed, the Court specifically noted that "[t]his distinguishes this case from those in which the parties disagree as to the validity or necessity of a safety requirement." *Id.* In the instant case, APL has presented no evidence that the vaccine mandate was job-related or consistent with business necessity.

APL repeatedly argues that Tarquinio failed to present "current medical documentation." This simply is not correct. Tarquinio presented proof of past Lyme disease and a verification of <u>current</u> "Chronic Lyme and Lyme-induced Immune Dysregulation." APL did not present any evidence that the verification from the treating doctor was false or out of date.

In conclusion, APL violated the ADA by terminating Tarquinio and refusing to provide an accommodation when it was aware that she posed no direct threat to others and was able to perform the essential functions of her position without being vaccinated.

## III.  THE INTERACTIVE PROCESS BROKE DOWN BECAUSE APL AND DR. LAM IMPOSED UNLAWFUL DEMANDS ON TARQUINIO.

The District Court explicitly granted summary judgment against Tarquinio because it found fault in Tarquinio's participation in the interactive process.  JA290.  The District Court blamed the breakdown in the interactive process on Tarquinio's refusal to sign APL's medical authorization form.  JA289.  The District Court committed reversible error in this regard for two reasons.

First, the interactive process is not intended as a forum for expressing skepticism toward a medical condition.  It is process for finding a way for a disabled employee to continue working.  Here, the solution was obvious—allow Tarquinio to continue as before, working unvaccinated.

Second, even if APL justifiably took the step of engaging in the interactive process, it did so in an illegal way.  APL's release form was overly broad and inherently illegal.  APL does not even attempt to argue that its medical authorization form complied with the requirements of HIPAA.  Instead, APL deflects and points out that it is not bound by the medical confidentiality provisions of HIPAA.  But that is precisely the point.  Once Tarquinio signed the medical authorization form demanded by APL, it would have had Tarquinio's explicit permission to make any inquiries, speak to any doctors, collect any and all medical records, and be able to disseminate all of Tarquinio's medical records to anyone.  HIPAA would not have

6

prevented such abuses.

APL contends that Tarquinio waived the argument that the release was overly broad by failing to raise it below.  This is factually inaccurate.  At JA76 Tarquinio explained in her deposition that she refused to sign the release because "you wanted to have <u>all my detailed medical records</u> and I had an issue with that because to me that's private information."  (Emphasis added).

APL made clear that it was demanding that Tarquinio sign "the" release form, which was given to her in blank format that APL could fill out as it saw fit.  JA278.  APL did not offer to narrow the release form to Chronic Lyme issues or Immune Dysregulation issues, limit it in time, or narrow how it could use the form or the information it obtained.

The District Court erroneously cited Tarquinio's refusal to sign APL's medical release form as the key evidence that Tarquinio caused the breakdown in the interactive process.  JA289.  The Court failed to scrutinize the unlimited nature of the medical release form, which causes it to be unlawful under the ADA.  *E.E.O.C. v. Blue Sky Vision, LLC*, No. 1:20-CV-285, 2021 WL 5535848, at *8-9 (W.D. Mich. Nov. 1, 2021); *Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 339 (4th Cir. 2022) (holding

that for a medical inquiry to be "consistent with business necessity it must be no broader or more intrusive than necessary").[1]

APL's medical release form was a blanket request for her medical records with no limiting language. It was not "consistent with business necessity." Therefore, Tarquinio's decision to not sign the medical release form cannot be used as evidence that she caused the breakdown in the interactive process. She was merely refusing to give her employer access to medical records that were not related to her disability.

In short, the District Court erred in holding that Tarquinio's decision not to sign APL's medical authorization form constituted, as a matter of law, a fatal failure to cooperate in the interactive process. The interactive process broke down because of APL's conduct, not Tarquinio's conduct. At a bare minimum, a reasonable jury could find that Tarquinio acted reasonably and that APL acted illegally and unreasonably.

In a similar vein, the District Court erred when it held, as a matter of law, that Tarquinio acted unreasonably because she refused to consider "reasonable accommodations other than the one she demanded." The reasoning of the District Court on this point lacks logic. APL admits that it was refusing to offer any

---

[1] APL claimed that Tarquinio's reliance on *Coffey* "makes no sense." (APL Brief p. 34). However, Coffey holds that even if a medical inquiry implicates a vital business necessity, the inquiry still must be "no broader or more intrusive than necessary." In *Coffey*, the employer demanded information about the employee's drug use and the impact of that drug use on the employee's ability to conduct his essential job functions. The employer's inquiries were required to comply with U.S. Department of Transportation regulations.

accommodations: "[A]n accommodation was not offered." (APL Brief p. 36). Tarquinio, on the other hand, was willing to engage in any other disease mitigation measures such as testing, social distancing, working from home, etc. JA120, JA125. The point is that APL did not offer any accommodation and, instead, insisted on vaccination when it never justified the need for vaccination given Tarquinio's job duties.

APL cites *Rowlett v. Baltimore City Police Dep't,* 2023 WL 2664232 (D. Md. 2023) and *Lashley v. Spartanburg Methodist Coll.,* 66 F.4th 168 (4th Cir. 2023) for the proposition that the employer cannot be found liable if the employee causes the breakdown in the interactive process (APL Brief p. 20). APL misreads these cases. In *Rowlett* the employee abandoned the interactive process. 2023 WL 2664232, at *10. In *Lashley* the employer was left guessing what the accommodation might entail. 66 F.4th at 179. Neither situation exists in this case.

Dr. Lam is not an expert in immunology. JA218. Once he received a signed verification from Tarquinio's licensed and specialized physician, he was able to do his own research and speak to the specialists of his choice. He had no right to impose on the employee the duty to educate him in a particular specialty. APL and Dr. Lam did not have any basis, at the time they denied Tarquinio's exemption request, to doubt that she had those conditions. Still, they insisted that Tarquinio pay her physician to act as an expert witness and explain the conditions to Dr. Lam. Dr. Lam

9

professed a lack of understanding as to Tarquinio's conditions and Dr. Schwartz's verification.  After that Dr. Lam did nothing more to educate himself.  Instead, he placed the burden of proof on Tarquinio and her physician to convince him the vaccine was contraindicated for Tarquinio.  The ADA does not permit this.

APL cites *Kelly v. Town of Abingdon, Virginia*, 90 F.4th 158, 167 (4th Cir. 2024) for the proposition that Tarquinio had to provide a "logical bridge" between her stated condition and her need for an accommodation from APL's vaccine mandate.  (APL Brief p. 28).  The facts of *Kelly* make the case wholly distinguishable.  In *Kelly*, the need for a "logical bridge" was to put the employer on notice that the employee was requesting an accommodation from an employer policy due to an ADA disability.  90 F.4th at 167-68.  In *Kelly*, the employee's lawyer only sent a vague letter regarding "foster[ing] a well-running office based on the principles of mutual respect, clear communication, and ... well-defined roles."  *Id.* at 168.  Thus, the *Kelly* employer was not put on notice of the need for an ADA accommodation.  APL, on the other hand, was indisputably on notice of Tarquinio's need for an accommodation, the policy from which she sought an exemption, and the specific medical condition that gave rise to the need for the accommodation.

If Dr. Lam was truly in doubt about Chronic Lyme and Lyme-induced Immune Dysregulation and the risks those diseases implicate, he could have done his own research.  In the absence of any medical research or reading, Dr. Lam concluded that

10

Tarquinio's condition would tolerate vaccination. But he was not the specialist, and he was not the patient who might suffer the consequences of his decision. He did not even have a doctor/patient relationship and could not be held responsible for an erroneous decision. Moreover, Dr. Lam never once determined that vaccination was essential to Tarquinio's ability to perform her job. No matter how much more information APL was given, there would remain uncertainty about the impact of the vaccines on someone with Tarquinio's conditions. No study had been published to address the safety of the vaccines for individuals with Chronic Lyme and Lyme-induced Immune Dysregulation. Neither APL nor Tarquinio's treating physician could give her assurances that the vaccine would be safe for her. And APL could never explain why Tarquinio needed to be vaccinated in order to perform the essential functions of her position.

APL contends that Tarquinio's accommodation request was denied "because Tarquinio … refused to allow APL to speak to her providers." (APL Brief 9). But, there is no requirement under the ADA that an employee sign an unlimited medical release for medical records or permit the employer to speak directly to the employee's medical providers. *See Mays v. Bd. of Com'rs Port of New Orleans,* 2015 WL 6605545, at *19 (E.D. La. Oct. 29, 2015) (even if the plaintiff's refusal to sign the release form was improper this would not prevent the employer from being found liable for failure to accommodate). *See also, Monterroso v. Sullivan &*

*Cromwell, LLP,* 591 F. Supp. 2d 567, 581 (S.D.N.Y. 2008) (the fact that the employer insisted on receiving a medical release form and the employee refused to sign it is not evidence of the employee's failure to engage in the interactive process). In short, there is a dispute as to the inferences that can be drawn from the facts. It is at least as reasonable for the trier of fact to conclude that APL was at fault for the breakdown as Tarquinio. Therefore, a jury issue was present and the Court erred by granting summary judgment.[2]

### IV.  TERMINATING TARQUINIO BECAUSE SHE WOULD NOT COMPLY WITH APL'S VACCINATION POLICY BECAUSE OF HER DISABILITY IS EQUIVALENT TO TERMINATING TARQUINIO BECAUSE OF HER DISABILITY.

The District Court and APL erroneously made the illogical distinction that Tarquinio was terminated because she could not comply with APL's vaccine mandate rather than being terminated because she possessed a disability. This is illogical because Tarquinio refused to comply with the vaccine mandate because of her disability. The "but-for" causal link is not lost. But for her disability, Tarquinio would not have been terminated.

APL raises several minor points in its attempt to cut the causal link. APL argues that when an employee refuses to comply with a company policy there cannot

---

[2] APL argues that the "clearly erroneous" standard applies to factual findings by the lower court. (APL Brief, p. 16). This is simply incorrect and is contradicted by the "standard of review" section of its brief. The cases supporting the *de novo* standard in reviewing a summary judgment ruling are legion and too numerous to warrant citation here.

be a but-for nexus between the termination and the disability. (APL Brief p. 39). APL quotes a District Court opinion to support this argument but misconstrues the holding. In *Jorgenson v. Conduent Transp. Sols., Inc.,* 2023 WL 1472022, at *1 (D. Md. Feb. 2, 2023), *aff'd,* 2023 WL 4105705 (4th Cir. 2023) the employee refused to comply with a policy that only required him to state his vaccine status.[3] *Id.* at *1. Employee's that were not vaccinated were required to conduct certain COVID mitigation measures, such as masking, but were not required to receive a COVID vaccine. *Id.* The employee then refused to comply, but his failure to comply the employer policy was not because of his disability thus breaking the but-for nexus. *Id.* In contrast, it is indisputable that Tarquinio not complying with APL's vaccine mandate was directly because of her disability. The but-for nexus is clear.

Additionally, APL contends that Tarquinio could have accepted the Johnson and Johnson vaccine because it was not developed using mRNA technology. This contention fails for three reasons. First, this issue was not decided by the District Court. Second, the citations to the record do not support the factual underpinnings of this contention—Tarquinio was concerned about antigens, from whatever source. JA87, JA122, JA128. Third, there is no evidence in the record to support the contention that APL ever discussed this possibility in the interactive process.

---

[3] In *Jorgenson*, the employee represented himself pro se and did not argue that the employer's vaccine attestation policy was, itself, an unlawful medical inquiry under the ADA. 2023 WL 1472022, at *3.

## V. THE DISTRICT COURT ERRED IN CREDITING "PUBLIC SAFETY" CONCERNS WHEN THERE WAS NO EVIDENCE IN THE RECORD THAT TARQUINIO CONSTITUTED A "DIRECT THREAT" TO HER CO-WORKERS OR OTHERS.

The District Court held that APL's vaccine mandate was job-related and consistent with business necessity because it was "put in place to protect the public safety of all employees." JA292. This appears to harken to the "direct threat" defense. In relying on this assessment, the District Court erred for at least two reasons.

First, the District Court supported its conclusion with only conclusory statements even though the direct threat defense requires an extensive and "individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Wood v. Maryland Dep't of Transp.,* 732 Fed. Appx. 177, 181 (4th Cir. 2018). The District Court failed to undertake this analysis and never mentioned or analyzed the essential functions of Tarquinio's specific job as a Systems Engineer. APL cannot show that it undertook an individualized assessment into Tarquinio's ability to safely perform the essential functions of her job because APL applied the vaccine mandate to each and every APL employee. JA166. The vaccine mandate even applied to remote employees that could not physically contract or spread the virus at APL sites. *Id.* A blanket policy requiring medical inquiries of all employees, regardless of their specific job functions, is antithetical to the individualized assessment of risk that the ADA demands. The direct threat

14

defense does not allow employers to act as legislatures and implement sweeping public safety measures.

Second, for the direct threat defense to apply, the medical inquiry must gauge whether there is a "significant risk of substantial harm to the health or safety of the individual or others that *cannot be eliminated or reduced by reasonable accommodation.*" 29 C.F.R. § 1630.2(r). (Emphasis added). APL admitted that it "granted 52% of the medical exemption requests it received from the Vaccination Policy." (APL Brief p. 41). Obviously, accommodations that did not create a "direct threat" were possible.

## VI.   CONCLUSION

During the COVID-19 pandemic, the Centers for Disease Control and Prevention (CDC) was strongly in favor of vaccination. However, Congress never passed a law requiring universal vaccination and did not amend the Americans with Disabilities Act. Indeed, the CDC recognized that certain medical conditions dictated against vaccination and it is indisputable that the COVID-19 vaccines sometimes cause adverse reactions.

Against this backdrop, APL took a position that vaccination of its employees was a good idea and that the costs and benefits of vaccination generally outweighed the risks. Nonetheless, APL remained bound by the strictures of the ADA. The ADA prohibits medical inquiries that are not job-related and consistent with business

15

necessity.   The ADA prohibits employers from discriminating against employees because of a disability if they can perform the essential functions of their position. Finally, and only after an employer perceives that an employee is unable to perform some aspect of her job, the employee and the employer are required to engage in an interactive process to determine if there is a reasonable accommodation that will allow the employee to perform the essential functions of the job.

Here, APL imposed the CDC's vaccine recommendations as if they had the force of law.   Dr. Lam was of the view that, since the CDC did not publish a recommendation about patients with Chronic Lyme and/or Lyme-induced Immune Dysregulation, APL should terminate employees who did not comply with the vaccine mandate.   Dr. Lam and APL failed to consider the essential functions of Tarquinio's job and the fact that she had been performing that job for many years, and throughout the pandemic, without vaccination.   The personal views of Dr. Lam and District Court about the merits of the COVID-19 vaccines are irrelevant. Tarquinio provided APL sufficient evidence that she should receive a vaccine exemption and that she was able to perform her job.   That should have been enough.

Respectfully submitted,
**KSC LAW**

By:_____/s/_____
Francis J. Collins, Esq.
201 N. Charles Street, Tenth Floor
Baltimore, Maryland 21201
(410) 244-1010 (telephone)
(410) 244-8001 (fax)
AIS No. 8501010118
Fed Ct. # 04272
fjcollins@kscadvocates.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 24-1432     Caption: Tarquinio v. Johns Hopkins Univ. Applied Physics Lab

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains _____ 4134 _____ [state number of] words

[ ] this brief uses monospaced type and contains _____ [state number of] lines

This brief or other document complies with the typeface and type style requirements because:

[ ] this brief or other document has been prepared in a proportionally spaced typeface using MS Word _____ [identify word processing program] in _____ [identify font size and type style]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using _____ [identify word processing program] in _____ [identify font size and type style].

(s) Francis J. Collins, Esq.

Party Name Sally Tarquinio

Dated: 8/23/2024

04/12/2020 SCC

18